[Sac. No. 1304. Department One.—February 7, 1905.]

ARTHUR M. NOBLE, Administrator, etc., of Deborah H. Lee, Appellant, v. CLARA D. L. GARDEN et al., Respondents.

ESTATES OF DECEASED PERSONS—GIFT CAUSA MORTIS—ASSIGNED CERTIFICATE OF STOCK—CONTROL OF DONOR—DELIVERY AFTER DEATH —PROPERTY OF ESTATE.—Where the deceased during her lifetime maintained dominion and control of certificates of stock in a building and loan association, and drew all dividends thereon after the

CXLVI. Cal.—15

delivery of assigned certificates to her agent, to whom she delivered other shares, with a pass-book, which was essential to a transfer of shares, the fact that she gave such agent oral directions to deliver the assigned shares after her death, and that he complied with such directions, does not establish a gift *causa mortis,* and such assigned shares remained the property of her estate.

ID.—CHANGE OF POSSESSION BEFORE DEATH ESSENTIAL—TESTAMENTARY DISPOSITION.—In order to constitute a gift *causa mortis,* there must be an actual or symbolical delivery and change of possession of the thing given, or of the means of obtaining possession and control thereof, so as to constitute an executed transfer legal or equitable, during the lifetime of the donor; otherwise it is a testamentary disposition, good only if made and proved as a will.

APPEAL from a judgment of the Superior Court of San Joaquin County. Frank H. Smith, Judge.

The facts are stated in the opinion.

Plummer & Dunlap, Woods & Levinsky, and Sheldon G. Kellogg, for Appellant.

Nicol & Orr, for Respondents Clara D. L. Garden et al.

Budd & Thompson, for Respondent San Joaquin Valley Building and Loan Association.

COOPER, C.—This action was brought to obtain a decree that twenty-nine shares of the capital stock of the San Joaquin Valley Building and Loan Association is the property of the estate of Deborah H. Lee, deceased. Findings were filed upon which judgment was entered for defendants. This appeal is from the judgment on the judgment-roll and a bill of exceptions.

The question is as to whether or not the title to the property in controversy passed by a gift *causa mortis* during the last illness of deceased. The facts are substantially as follows: On October, 1892, deceased was ill, suffering from a paralytic stroke, and under the care of a nurse and physician. She sent for Arthur M. Noble, told him that she had about fifteen thousand dollars in money, and wanted his advice as to what was best "for her to do so as to produce her some income and still have control of it while she lived." Noble advised her to take stock in the San Joaquin Valley Building

and Loan Association, a corporation, of which he was secre-
tary; that the stock would pay dividends; and that she could
draw the principal or any part of it at any time she pleased.
She said to Noble: "Suppose I am sick a long time and want
to use more money, how can I get the money?" Noble ex-
plained to her that the money would be represented by the
different certificates in different denominations, and that
she could surrender any certificate at any time and get the
money. She replied: "I want to be sure that this does
not go out of my control. I have bills to pay and expenses
to meet and I want money available for that purpose." Noble
told her that it would be under the conditions desired by her;
that the by-laws of the association provide that the money
represented by the certificates can be withdrawn at any time,
but that she would lose the interest since the last dividend
was paid, in case she desired the money before a dividend
became due. Deceased told Noble to issue the certificates in
her name, and they were so issued, nineteen in all. ˙ She also
gave Noble a list of persons to whom she wanted the cer-
tificates assigned. Noble prepared the certificates and assign-
ments as requested, and delivered them tò deceased, who
kept them a few days and again sent for Noble, and gave him
the certificates with the remark: "I want you to take these
certificates and keep them in your safe, and when anything
happens to me, if I should pass away, whatever is left from
these certificates deliver them to the people to whom they
have been assigned."

Among the certificates were Nos. 467, 468, and 481, being
those in controversy, 481 being for twenty-five shares of the
capital stock, and 467 and 468 for ten shares each. On the
back of certificate 481 was the following writing: "For valu-
able consideration I do hereby transfer and set over unto
Clara D. L. Garden 25 shares of the stock of the San Joaquin
Valley Building and Loan Association standing in my name
as per the books of the corporation. Certificate No. 481,
issued October 17, 1902. Witness my hand this 17th day of
October, 1902." The same being duly signed by deceased and
witnessed. The certificate also contained the clause: "No
transfer shall be valid unless the pass-book of the shareholder
transferring is also surrendered, and the association is not
bound except for the value of the shares as shown by the pass-

book, of even number with the certificate." The assignments of Nos. 467 and 468 were in the same form, except one of these was assigned to Helen L. Garden and the other to David L. Garden. The pass-book was delivered to Noble and thereafter remained in his possession.

In the early part of February, 1903, Noble took all the certificates and went to see deceased, who was still bedridden and rapidly failing. He then at her request paid her the accrued dividends on the entire stock ($159), and she surrendered and had canceled two of the certificates, one for one hundred dollars and and the other for one thousand dollars, and received the money therefor. She handed the remaining certificates back to Noble and asked him to keep them safely for her, and in case of her death to deliver them to the persons to whom they were respectively assigned.

On March 12, 1903, deceased died, without having revoked said assignments or any of them. The certificates were then in the safe in the possession of Noble, who afterwards delivered them to the parties named in the respective assignments.

Gifts *donatio mortis causa* had their origin in the civil law, and were adopted with slight modifications into the common law. (*Ward* v *Turner*, 2 Ves. Sr. 431.)

Justinian defines a *donatio mortis causa* as "that which is made to meet the case of death, as where anything is given upon condition that, if any fatal accident befalls the donor, the person to whom it is given shall have it as his own; but if the donor should survive, or if he should repent of having made the gift, or if the person to whom it has been given should die before the donor, then the donor shall receive back the thing given."

It was much doubted by the early jurists whether such disposition of property should be considered as a gift or as a legacy. In some respects it is similar to a legacy. A legacy is always given in view of the possible death of the donor, and so must a gift *causa mortis* be given; but in the former case the donor need not be sick and in present peril of death, while in case of the latter it must be given in anticipation of a speedy death from a present sickness or impending peril. In either case the absolute title to the property does not become vested in the donee, and in either case the gift or legacy may be revoked at any time before the death of the donor.

(Thornton on Gifts, sec. 20, and cases cited.) It is there said: "But in a gift *causa mortis* a written instrument is not necessary; it may be, and usually is made by parol, and the possession of the thing given must be absolutely delivered to the donee before the death of the donor and the donee. . . . The most characteristic mark of distinction between a legacy and such a gift is the change of possession. From the nature of the *donatio*, it is apparent that the infallible test which must distinguish it from a testamentay gift, is delivery, a change of dominion *in præsenti*. Without this there is really nothing to distinguish it from an ordinary testamentary bequest."

In the early case of *Ward* v. *Turner*, 2 Ves. Sr. 431, it was held that an actual delivery is indispensable to vest the property, if the subject-matter is capable of delivery. The lord chancellor traces the rule in its early stages and concludes: "Therefore from the authority of Swinburne, and all these cases the consequence is, that by the civil law, as received and allowed in England, tradition or delivery is necessary to make a good donation *mortis causa.*"

In *Keniston* v. *Sceva*, 54 N. H. 36, the court said: "The essential requisites of a valid gift *causa mortis* are well known and perfectly understood. They have in no respect changed since they were established and declared by the civil law, except in this particular, that under the civil law delivery of the property was not absolutely essential to the validity of the gift—an element which, in our law, cannot be dispensed with. (Sander's Justinian, 228, 229; 1 Williams on Executors and Administrators, pt. 2, b. 2, ch. 2, sec. 4, p. 544; 1 Story's Equity Jurisprudence, sec. 607a; *Smith* v. *Kittridge*, 21 Vt. 244.)"

In *Basket* v. *Hassell*, 107 U. S. 602, the question is elaborately discussed and the authorities collected. The supreme court of the United States there said: "If the gift does not take effect as an executed and complete transfer to the donee of possession and title, either legal or equitable, during the life of the donor, it is a testamentary disposition, good only if made and proved as a will. . . . But there must be delivery of possession. The contract must have been executed. The thing given must be put into the hands of the donee, or placed within his power by delivery of the means of obtaining it. . . . Without delivery the transaction is not valid as an exe-

cuted gift; and without consideration, it is not valid as a contract to be executed. The decision in *Wright* v. *Wright* [1 Cow. (N. Y.) 598] was founded on a supposed distinction between a gift *inter vivos* and a *donatio mortis causa.* But there appears to be no such distinction. A delivery of possession is indispensable in either case. . . . A delivery which does not confer upon the donee the present right to reduce the fund into possession, by enforcing the obligation according to its terms, will not suffice. A delivery, in terms which confers upon the donee power to control the fund only after the death of the donor, when by the instrument itself it is presently payable, is testamentary in character and not good as a gift.''

This court has laid down the same rule in the late case of *Pullen* v. *Placer County Bank,* 138 Cal. 170,[1] where it is said: ''A gift vests the donee with the absolute property in the thing given, and it is no longer subject to the control of the donor. If, on the other hand, the thing given remains under the control of the donor or (except in case of a gift *causa mortis*) is subject to his revocation, his gift is not complete. There is no difference, however, in this particular between a gift *inter vivos* and a gift *causa mortis.* In either case it is not complete unless there is an actual or symbolic delivery to the donee of the thing to be given.''

Our code, in article III of the Civil Code (sec. 1146 et seq.), provides certain rules as to gifts *inter vivos* and *causa mortis,* and that ''A verbal gift is not valid unless the means of obtaining possession and control of the thing are given, nor, if it is capable of delivery, unless there is an actual or symbolical delivery of the thing to the donee.'' (See, further, Anderson's Dictionary, title ''Donatio Mortis Causa''; Thornton on Gifts, sec. 21 et seq.; *Harris* v. *Clark,* 3 N. Y. 93;[2] *Bedell* v. *Carll,* 33 N. Y. 585; *Ruiz* v. *Dow,* 113 Cal. 497; *Calkins* v. *Equitable etc. Assn.,* 126 Cal. 534.)

We do not think there was any delivery of the certificates of shares of stock made in the lifetime of the deceased. She retained control and dominion of them, and expressly stated to Noble that she wanted to be sure that the property did not go out of her control. He told her it should not. As her agent, he kept the certificates, and brought them to her when

---

[1] 94 Am. St. Rep. 19.          [2] 51 Am. Dec. 352, and note.

she had two of them canceled and received eleven hundred dollars for them. She expressed to Noble her intention when she said: "If I should pass away, whatever is left from these certificates deliver to the people to whom they have been assigned." The title certainly did not vest in the parties to whom the assignments were made, because it was expressly stated that it should remain in deceased. If the title remained in deceased, the transaction shows only an intention to make a gift. By the terms, understanding, and intention of deceased, the gift was not to take effect until her death. In such case the disposal is testamentary and not a gift. (*Hart v. Ketchum*, 121 Cal. 429.) However much we may desire to carry out the intentions of deceased, we cannot do so in this case, because the effect would be to hold valid an oral testamentary disposition of her property. The code has provided the kinds of wills that may be made and the essential requisite of each kind. The oral directions to Noble by deceased did not constitute any one of the kinds of wills authorized by the codes.

It follows that the judgment should be reversed.

Gray, C., and Harrison, C., concurred.

For the reasons given in the foregoing opinion the judgment is reversed.   Angellotti, J., Shaw, J., Van Dyke, J.

Hearing in Bank denied.

Beatty, C. J., dissented from the order denying a hearing in Bank.