[L. A. No. 7848. In Bank.—September 27, 1927.]

# L. M. LEFROOTH, Appellant, v. GEORGE G. PRENTICE et al., Respondents.

[1] FRAUDULENT CONVEYANCES — DEBTOR AND CREDITOR — TRANSFER— CONSIDERATION — DELIVERY AND ACCEPTANCE.—In an action, under sections 3439 and 3442 of the Civil Code, to subject certain real property to the payment of a judgment, which property was transferred by the judgment debtor to his wife and children, testimony of the wife that she actually received and had in her custody certain bonds which her husband claimed to have given her long prior to the transfer of the property in question, and which the husband afterward used in certain speculations, was sufficient to justify a finding of the court that as to her there was an intention to give, a delivery and acceptance of the securities, and to form a sufficient basis for a transfer of an interest in the real property for the value of such securities.

[2] ID.—CONSIDERATION FOR DEED — GIFT — EVIDENCE. — Where the judgment debtor, in such a case, upon the purchase by him of certain bonds, deposited them in a safety deposit box in a trust company, to which he, his wife and the trust company had access, with instructions to the trust company to collect the coupons and credit the interest to the account of his children, each child having a separate account in which the father was trustee, at the time of the deposit of the bonds a memorandum being made out by the father in the case of each of the three children on the wrapper containing the bonds, stating that the bonds, which were described, were deposited for the particular child and the bonds being afterward mailed to the children to the family residence and being thereafter used by the father in speculation, the evidence is insufficient to show a transfer of the bonds to the children.

[3] ID. — GIFT—LAW APPLICABLE TO — PRESUMPTION.—To test the efficacy of such a transaction to accomplish a completed gift, the law of the state where the transaction occurred should be applied; but in the absence of a showing as to what the law of that state is it will be presumed that the rule there pertaining to such transaction is the same as the rule in this state.

---

2. Presumption of fraud from retention of possession, note, 24 L. R. A. (N. S.) 1131. See, also, 12 R. C. L. 552. Change of possession sufficient as to creditors, note, 97 Am. Dec. 340. See, also, 12 R. C. L. 551.

3. See 5 Cal. Jur. 431; 10 R. C. L. 890.

[4] ID. — DEFINITION OF GIFT — VERBAL GIFT — POSSESSION AND DE-
LIVERY.—Under the code, a gift is a transfer of personal property,
made voluntarily, and without consideration; and a verbal gift
*is not valid, unless the means of obtaining possession and control
of the thing are given, nor, if it is capable of delivery, unless
there is an actual or symbolical delivery of the thing to the
donee.*

[5] ID. — GIFT—DELIVERY—WRITTEN INSTRUMENT.—While the delivery
of personal property intended as a gift may be symbolical, such as
delivery of a written instrument without physical delivery of the
property itself, so long as the instrument is one upon which
delivery might be compelled, the interest intended to be trans-
ferred being vested in the transferee upon the donor's delivery
of the grant, a memorandum on the outside of a wrapper con-
taining securities which states the securities are deposited in a
bank in trust, although the memorandum is in the handwriting of
the alleged donor, is insufficient to show a delivery where it con-
tains no signature and no words purporting to be a grant or
transfer.

[6] ID.—VOLUNTARY TRUST—REQUIREMENTS FOR.—The requirements of
a voluntary trust are, as to the trustor and beneficiary, words of
the trustor, indicating with reasonable certainty, first, an intention
on the part of the trustor to create a trust, and, second, the
subject, purpose, and beneficiary of the trust.

[7] ID.—INSUFFICIENT SHOWING OF TRUST.—Where it cannot be ascer-
tained from a memorandum and the facts surrounding the trans-
action, which it is contended created a trust in certain securities,
who, if anyone, was to be the trustee, what the purpose of the
so-called trust was, the duration of the estate granted, the nature
and quantity of interest which the beneficiaries were to have,
and the manner in which the trust was to be performed, a trust
is not established.

[8] ID. — TRUST IN PERSONALTY — PAROL EVIDENCE. — *It is a cardinal
rule that trusts in personalty may be created, declared, or ad-
mitted verbally and may be proved by parol evidence, but such
evidence must at all times be clear and unequivocal.*

4.  See 13 Cal. Jur. 32, 37.
5.  See 13 Cal. Jur. 32,
8.  Creation of trust in personalty by parol, notes, 51 Am. St.
Rep. 389; 51 L. R. A. (N. S.) 1208. Degree or intensity of parol
proof necessary to establish a trust, note, 23 A. L. R. 1500. See,
also, 25 Cal. Jur. 154, 248; 26 R. C. L. 1194.

[9] ID. — DEBTOR AND CREDITOR — INSOLVENCY — INTENT TO DEFRAUD.
Under section 3442 of the Civil Code, any transfer or encumbrance of property made or given voluntarily, or without a valuable consideration, by a party while insolvent or in contemplation of insolvency, is fraudulent and void as to existing creditors, and under such a showing the fraudulent intent on the part of the grantee of such transfer is immaterial; nor is it necessary to show an intent to defraud the creditors.

[10] ID. — INCONSISTENT FINDING—KNOWLEDGE OF INDEBTEDNESS.—In such a case, it is impossible to reconcile the fact that the court found that the judgment debtor, who was carrying on a stock brokerage business and with whom the creditor had an open running account over a long period, buying and selling stocks, concealed from the creditor, during the whole period of her transactions with him, the status of her account and the profits made in transactions for her and the fact that he was indebted to her in various sums aggregating nearly forty thousand dollars, with a finding that he did not know whether or not he was indebted to her at all.

[11] ID. — TRANSFER IN CONTEMPLATION OF INSOLVENCY — FINDINGS— EVIDENCE.—In this case it is held that there is a conflict in the findings directly reflecting upon the question as to whether or not the defendant judgment debtor was contemplating insolvency in the execution of the deed in question, and that the evidence is not sufficient to sustain a finding that the debtor did not contemplate insolvency at the time the deed was executed.

[12] ID.—FINDINGS — CONFLICTING EVIDENCE. — While a finding will not be disturbed on appeal if there is a substantial conflict in the evidence from which it springs, the evidence, in order to raise a conflict, must be such as to present a fair and reasonable ground for a difference of opinion.

[13] ID. — EVIDENCE—TRANSFER OF PROPERTY TO CHILDREN—INTENT.— In such a case, it was prejudicial error to exclude evidence as to whether or not the judgment debtor, at the time he claims to have disposed of bonds in trust for certain of his children, gave any bonds to his oldest son, who was manager of his brokerage business, and whether the latter had any bonds left at the time of the making of the deed in question, and also whether the

9. Presumption that voluntary transfers are in fraud of creditors, note, 119 Am. St. Rep. 556. See, also, 12 R. C. L. 592. When voluntary transfers are fraudulent as to creditors, notes, 7 Am. Dec. 362; 14 Am. Dec. 703; 28 Am. Rep. 721; Ann. Cas. 1914A, 601. See, also, 12 Cal. Jur. 984, 1019; 12 R. C. L. 596. Validity of voluntary conveyances, note, 4 L. R. A. 353.

12. See 2 Cal. Jur. 29.

judgment debtor had any bonds in his hands at the time of the execution of the deed which he placed in trust for this son, who was not a grantee under the deed, as the transaction with this son was material as to the *bona fides* of the transaction with the other children and the wife and the intent with which the deed was made, and it was also material on the question of insolvency, where, if this defendant was indebted to this son in an amount comparable with the indebtedness admitted to the wife, he was insolvent beyond question at the time of the execution of the deed.

---

(1) 30 C. J., p. 704, n. 74.    (2) 27 C. J., p. 569, n. 58.    (3) 22 C. J., p. 151, n. 95; 28 C. J., p. 625, n. 80.    (4) 28 C. J., p. 620, n. 1, p. 633, n. 80.    (5) 28 C. J., p. 627, n. 34, p. 634, n. 94, p. 636, n. 11, p. 637, n. 19.    (6) 39 Cyc., p. 34, n. 48, p. 35, n. 66, p. 57, n. 20. (7) 39 Cyc., p. 86, n. 78.    (8) 39 Cyc., p. 51, n. 75, p. 84, n. 68. (9) 27 C. J., p. 509, n. 3.    (10) 38 Cyc., p. 1986, n. 82.    (11) 27 C. J., p. 833, n. 46.    (12) 4 C. J., p. 886, n. 52.    (13) 27 C. J., p. 805, n. 99.

APPEAL from a judgment of the Superior Court of San Diego County. E. A. Luce, Judge. Reversed.

The facts are stated in the opinion of the court.

Wright & McKee and C. M. Monroe for Appellant.

Sweet, Stearns & Forward for Respondents.

PRESTON, J.—This is an appeal from judgment in favor of defendants in an action, under sections 3439 and 3442 of the Civil Code, to subject certain real property to the payment of a judgment obtained by appellant against defendant George G. Prentice.

In 1916 said defendant opened a general brokerage office in San Diego under the name of "George G. Prentice & Co.," his son Gordon Prentice being associated with him, and through a connection with the brokerage house of Logan & Bryan he bought and sold stocks and bonds on the leading exchanges of the country. In August of that year appellant opened an account with him, dealing in stocks and grain; buying and selling securities outright and also operating on margin. She claims that in the early part of 1917 she became somewhat uneasy and suspicious of the status of her account and thereafter had a number of interviews with

Mr. Prentice, extending into late August and early September, at the last of which she insisted that he make good the losses he had caused her and threatened court action. She actually did bring suit against him on August 26, 1919, as a result of which on April 24, 1922, she obtained the above mentioned judgment for $46,848.12 with costs.

On September 14, 1917, but a week or two subsequent to appellant's alleged threat of court action, said defendant conveyed to his wife and three of his children a large ranch situate in San Diego County, California. It is this conveyance which appellant alleges in her complaint herein was made without consideration, for the purpose of hindering, delaying and defrauding defendant's creditors, particularly herself, and in contemplation of insolvency. Defendants on the other hand claim that the conveyance was made in good faith and for a valuable consideration. The evidence is without substantial conflict, as the facts and circumstances surrounding the transaction were within the private knowledge of defendant and his family. It is admitted that at the time of making said deed on September 14, 1917, no immediate consideration passed to defendant George G. Prentice from his co-defendants, but the circumstances relating to his alleged indebtedness to his family concerning a gift transaction in securities in the year 1911 in satisfaction of which they claim said deed was executed are hereinafter set forth.

In 1911 the Prentice family moved from New Haven, Connecticut, to San Diego, California, where Mr. Prentice engaged in extensive and unfortunate speculations upon the stock market. In the spring of 1912 he purchased the ranch property in question for the sum of $105,000, although its present value is probably more than double that amount. He continued to speculate extensively and to lose money and used in his speculations certain bonds and securities alleged to have been given to his wife and children as hereinafter set forth. At the time the deed to the ranch was executed Mrs. Prentice was visiting in the east and her first knowledge of it was when she received it through the mail. Her husband never parted with possession of the ranch property but maintained his control thereof, and collected and used the proceeds from it without an accounting of any kind to his wife or children. In 1921, however, he did open a new

bank account in the name of "Prentice Ranch," to which he transferred the balance from his own account, and thereafter instead of signing checks in his own name, he signed them in the name of "Prentice Ranch" by himself as manager thereof. Some two months after said conveyance defendant and his wife executed a deed purporting to grant to the San Diego Gas and Electric Company an eighty-foot easement over said ranch property, and received the consideration therefor. The children did not join in this deed and received none of the proceeds from it. Apparently there has been no attempt to fix the undivided interests to which it is claimed they are entitled. Although the oldest daughter reached her majority and married, she received no accounting of her interest, nor did she receive any of the revenues from nor was she charged with any part of the expenses of said ranch. The same is true of the second daughter, who reached her majority in 1920. Subsequent to the conveyance defendant was appointed guardian for the minor son, Hillyer, but no accounting was ever made of the alleged interest of said minor son in the ranch. It will also be noted that the oldest son, Gordon Prentice, was omitted from the conveyance. Yet it appears that certain securities were also set aside for him by his father in 1911. The trial court refused to receive evidence as to what became of them but the record does show that they were no longer in the possession of the Prentice family at the time of the conveyance.

Appellant, through her counsel, makes earnest and spirited attack upon the judgment upon two general grounds, to wit: The insufficiency of the evidence to support the findings in essential particulars and errors of law in the exclusion of certain testimony. Under the first ground it is contended that at least as to the children of said defendant George G. Prentice the transaction represented by the deed was voluntary and without a valuable consideration to support it, the findings of the court to the contrary notwithstanding. And further, conceding the soundness of the above contention, she contends that the evidence shows without substantial conflict that said defendant was, if not actually insolvent, certainly acting in contemplation thereof in making the deed in question, also the findings of the court to the contrary notwithstanding. She further asserts that we

may look at the facts existing and the events occurring shortly before and after the making of the deed in considering this contention. The testimony, the exclusion of which is complained of, was cross-examination of said defendant debtor concerning his business relations with his son, Gordon, who, as above pointed out, was not made a grantee under the deed before us.

After a careful study of the record of the case in the light of the principles applicable thereto we are constrained to uphold appellant in each of the above positions.

[1] In so far as the transaction between the husband and the wife is concerned, the wife testified that she actually received the bonds herself and actually had them in her custody; that she had joint access to the safe deposit box with her husband. This testimony under our decisions would justify the finding of the court that as to her there was an intention to give, a delivery and lastly an acceptance of the securities by her. See *Hynes* v. *White*, 47 Cal. App. 549, 553 [190 Pac. 836], where a large number of decisions are reviewed and where rehearing was denied by this court. This would form a sufficient basis for a transfer in exchange for the value of such securities.

[2] The only evidence in the record from which it is claimed that the valuable consideration for such deed as to the three children of said Prentice is revealed, is that as to the so-called gift transaction in New Haven, Connecticut, about 1911 or 1912 above adverted to. This transaction may be partially stated in the language of the attorneys for defendant debtor: "The testimony shows that Mr. and Mrs. Prentice and at least the two older children went to the office of a broker in New Haven where the bonds were purchased. That after the purchase the bonds were put in a safety deposit box in the Union-New Haven Trust Company with instructions to collect the coupons and credit the interest to the account of the children, each child having a separate account, George G. Prentice, trustee. The evidence further shows that Prentice's instructions were carried out and the bonds remained in the Trust Company for three or four years. That during all that time the Trust Company collected the coupons and deposited the money in the respective children's names. A large number of statements of account were rendered from time to time by the Trust Com-

pany showing 'Helen Sheldon Prentice in account with The Union & New Haven Trust Company' and 'Janet Elizabeth Prentice, Geo. G. Prentice, Trustee, in account with The Union & New Haven Trust Company,' and 'Janet Elizabeth Prentice in account with the Union & New Haven Trust Company.' The moneys in these accounts were used to pay for the schooling and current expenses of the children. It further appears that at the time of depositing the bonds a memorandum was made out by George G. Prentice in the case of each of the three children, which, in each instance, was substantially the same except as to name of the child. Taking defendants' exhibit 'B' as an instance, such memorandum reads: 'Memorandum: Deposited to Hillyer Prentice in the Union & New Haven Trust Company, New Haven, Dec. 25, 1912, held in trust the following: 10 Seattle Electric bonds; 10 Union Electric Light bonds; 10 Northern Texas bonds; 10 East Ohio Gas bonds.' These memoranda were deposited with the Trust Company and remained there until the bonds were taken out—in the case of Hillyer Prentice, until March 25, 1916. They were then mailed to the children in San Diego, where the Prentice family was then residing, as shown by the envelopes in the various cases, the Hillyer Prentice memorandum being addressed to Hillyer Prentice, George G. Prentice, Trustee, 305 Spreckels Building, San Diego, Calif.''

It will be noted that we are not here concerned with the deposits to the credit of the children other than what may be shown therefrom concerning the securities themselves. To the above testimony, however, should be added the fact that the safe deposit box referred to was the safe deposit box of said George G. Prentice, to which his wife had access and to which it must be inferred that the bank also had access. So far as said children are concerned there is no evidence that they had then or ever had access to the box or that they ever had physical custody of any of the securities in question. There is no evidence whatsoever from which it may be found that said trust company received from said Prentice any instructions as to the custody, control, or disposition of the said securities themselves other than as to the coupons above referred to. The memorandum referred to was not delivered to the trust company but was

on a wrapper containing the securities and left, of course, with them in the safe deposit box.

There is no evidence from which it could be inferred that said trust company acted or agreed to act as the agent or trustee of the donees in connection with the securities. The testimony of Prentice himself in this connection may be profitably quoted here: "Q. You kept the control of those bonds, did you? A. They were put in trust in the Trust Company, New Haven Trust Company. I was trustee. Q. They never went out of your control, did they? A. No. Q. Did you draw up any document appointing yourself as trustee? A. No, only notified the Trust Company. . . . Q. And then there was never any evidence of this transfer of the bonds to your children other than that you deposited them in the bank for safekeeping, and had them credit the interest to the account of each one of these children and check out as trustee by you? A. That is the substance of it." It is nowhere shown or contended that the father ever surrendered actually or symbolically the dominion or control of any of the securities at any time. This is further evidenced by the fact that without the consent of the trust company, the alleged donees or anyone else, he sold said securities and used the proceeds for his own personal benefit.

[3] In reality to test the efficacy of said transaction to accomplish a completed gift the law of Connecticut should be expounded, as such law would control the transaction. In the absence of a showing as to what the law of Connecticut is we are required to indulge the presumption that the rule there pertaining to such transaction is the same as the rule in this state.

[4] Section 1146 of the Civil Code provides: "A gift is a transfer of personal property, made voluntarily, and without consideration." Section 1147 provides: "A verbal gift is not valid, unless the means of obtaining possession and control of the thing are given, nor, if it is capable of delivery, unless there is an actual or symbolical delivery of the thing to the donee." The rule announced by these sections has obtained without modification throughout all our decisions and may still be pointed to as correct. Another statement of the rule may be found in 28 Corpus Juris, 634, section 23, as follows: "In order to constitute an effectual delivery the donor must not only have parted with the pos-

session of the property, but he must also have relinquished to the donee all present and future dominion and control over it, beyond any power on his part to recall. The surrender must be so full and complete that, if the donor resumes control over the property without the consent of the donee, he will be answerable in damages as a trespasser. The retaining of control in the hands of the donor over the subject of the gift, or the reservation by the donor of any right to retake the property or appropriate it to other purposes, avoids the gift.''

[5] For the purposes of this case it may be assumed that George G. Prentice intended to make a gift of these securities to his children and also that, they being minors, of ages ranging from fourteen to four years of age, the law would accept the benefits of the gift in their behalf. The real question presented is: Was there within the limitations set by the law a delivery of such intended gift? There is likewise no question but that delivery may be symbolical such as delivery of a written instrument without physical delivery of the securities themselves so long as the instrument is one upon which delivery might be compelled. ''The interest intended to be transferred is, under section 1054 of the Civil Code, vested in the transferee upon the donor's delivery of the grant.'' (*Burkett* v. *Doty,* 176 Cal. 89, 92 [167 Pac. 518].) But here we have no evidence upon which to base the contention that there was a written instrument. The memoranda on the wrappers, while in the handwriting of the alleged donor, contained no signature, nor did they contain any words purporting to be a grant or transfer.

The case of *Giselman* v. *Starr,* 106 Cal. 651, 656, 657 [40 Pac. 8, 9], is instructive in this discussion. There S. C. Hastings doubtless had a *bona fide* intention of making a gift to his daughter Ella, who was incompetent. So apparent is this intention that it appears that he had himself appointed a guardian of the estate of his said daughter. In the inventory of her estate, which was duly verified by him, the note and mortgage in question were entered as the property of the incompetent. The note was exhibited to the appraisers by him and by them appraised at a valuation suggested by him. The testimony showed further that he expressed sympathy and anxiety for his afflicted child and said he was making provision for her and desired to make

such provision while he was living. "He said he had not yet turned over anything, but expressed his desire to do so." Speaking of that transaction, the court said: "This array of facts and circumstances makes a strong presentation of the intent of Hastings to give the note and mortgage to his daughter. It is established that upon one occasion, under oath, he declared them to be her property. But such declaration, however binding in good morals, is not of itself sufficient to establish a gift. No legal duty was imposed upon Hastings to give this particular property to his daughter, and, if the intended donation lacked anything of consummation, the promises or declarations were but *nudum pactum* and not enforceable. It is not here a question of acceptance of the gift by the incompetent which, the gift being advantageous to her, the law would presume; but the question is whether the gift was so completely made as to enable the law to presume its acceptance. To every gift delivery is essential. Says Chancellor Kent, speaking of negotiable instruments: 'Delivery in this, as in every other case, must be according to the nature of the thing. . . . It must be the true and effectual way of obtaining the command and dominion of the subject. . . . If the thing given be a chose in action the law requires an assignment, or some equivalent instrument, and the transfer must be actually executed.' The Civil Code declares that 'a verbal gift is not valid, unless the means of obtaining possession and control of the thing are given, nor, if it is capable of delivery, unless there is an actual or symbolical delivery of the thing to the donee.' (Civil Code, sec. 1147.) Hastings' attempted or intended gift fell short of these requirements. Lacking his indorsement of the note, his possession remained a possession in his personal and not in his representative character, and the gift failed of completion."

In the case of *Edwards* v. *Guaranty Trust etc. Bank,* 47 Cal. App. 86, 89 [190 Pac. 57, 59], after citing with approval the doctrine of *Provident Institution for Savings* v. *Sisters of the Poor, etc.,* 87 N. J. Eq. 424 [100 Atl. 894], the court said: " 'To constitute a valid gift *inter vivos,* the purpose of the donor to make the gift must be clearly and satisfactorily established, and the gift must be complete by actual, constructive or symbolical delivery, without power of revocation.' (20 Cyc. 1193.) In order to accomplish this, 'there

202 Cal.—15

must be a parting by the donor with all present and future legal power and dominion over the property.' (20 Cyc. 1196; *Tracy* v. *Alvord,* 118 Cal. 654 [50 Pac. 757]; *Pullen* v. *Placer County Bank,* 138 Cal. 169 [94 Am. St. Rep. 19, 66 Pac. 740, 71 Pac. 83]; *Simmons* v. *Savings Society,* 31 Ohio, 457 [27 Am. Rep. 521]; *Matthews* v. *Hanson,* 145 Va. 614 [134 S. E. 568].) That the law of this state is as stated in the Provident case, *supra,* will be seen by a perusal of that and the other cases cited therein, citing and quoting from the California cases at length." A rehearing in this case was denied by the supreme court. A careful examination of many cases reveals no exception to the rule announced in the above authorities. There is no different rule applicable to minors of tender years in a transaction with their parents than applies to a transaction between adults, for as far as the legal steps are concerned they are in the two cases identical. (*In re Acken's Estate,* 144 Iowa, 519 [Ann. Cas. 1912A, 1166, 123 N. W. 187].) The irresistible conclusion is that the father either did not intend to complete the gift or else, in attempting to execute his intention, fell short of making a delivery of the securities as he failed utterly to surrender complete dominion or any dominion over the same. The delivery of the securities was therefore incomplete and ineffective to pass title.

[6] It is difficult to gather clearly from the contention of respondent whether it is that the gift was completed by the donor constituting the bank the agent or trustee of the donees or whether he contends that he, as the father, became the trustee of the property donated by him to his children. We have not only examined the transaction in testing it for the legal requirements of a gift but also in order to ascertain whether or not it can be considered a declaration of trust in personal property in which the father may be considered the trustee for said children. The requirements of a voluntary trust are specified in section 2221 of the Civil Code as follows: " . . . A voluntary trust is created, as to the trustor and beneficiary, by any words of the trustor, indicating with reasonable certainty: (1) An intention on the part of the trustor to create a trust; and, (2) The subject, purpose and beneficiary of the trust." It is, of course, admitted that in personal property this trust relationship, if existing, may be established by parol testimony, but the

evidence above quoted, including the testimony of George G. Prentice, fixes the limitations upon the transaction. It will be noted that in addition to the testimony quoted above he was asked the following questions and gave the following answers: "Q. Did you draw up any document appointing yourself as trustee? A. No, only notified the Trust Company. Q. You put those bonds in the Trust Company under your name as trustee? A. No, under their names. Q. In the Trust Company's name as trustee? A. Under the individual child's name, and they collected the interest and credited the same to their account." From this testimony it is impossible to say whether the witness intended to constitute himself as trustee or whether he intended the trust company as trustee, and if the latter, the trust relationship at most extended no further than the collection of the interest and the crediting it to the account of the respective child for which it was intended. [7] But in any event taking the memoranda and all the facts surrounding the transaction, it is impossible to say that a valid trust in said securities in favor of said children as beneficiaries was created. Not only can it not be told who, if anyone, was to be the trustee, but it cannot be ascertained from the evidence what the purpose of the so-called trust was. In other words, the duration of the estate granted, the nature and quantity of interest which the beneficiaries were to have and the manner in which the trust was to be performed, are undeclared and too uncertain to be called an estate of any kind in the said children.

[8] It is a cardinal rule that trusts in personalty may be created, declared, or admitted verbally and may be proved by parol evidence, but the authorities are uniform to the effect that such evidence must at all times be clear and unequivocal. (*Silvey* v. *Hodgdon,* 52 Cal. 363; *Sheehan* v. *Sullivan,* 126 Cal. 189 [58 Pac. 543]; *Barker* v. *Hurley,* 132 Cal. 21 [63 Pac. 1071, 64 Pac. 480].) Mr. Pomeroy, in Equity Jurisprudence (fourth edition), section 1009, states the rule as follows: "The declaration of trust, whether written or oral, must be reasonably certain in its material terms; and this requisite of certainty includes the subject-matter or property embraced within the trust, the beneficiaries or persons in whose behalf it is created, the nature and quantity of interests which they are to have, and the manner in

which the trust is to be performed. If the language is so vague, general, or equivocal that any of these necessary elements of the trusts is left in real uncertainty, then the trust must fail.''

See to the same effect, *Wittfield* v. *Forster,* 124 Cal. 418, 421 [57 Pac. 219, 221], from which we quote the following: "If we apply the statutory declaration above quoted (sec. 2221, Civ. Code), and the principle found in the above language of Pomeroy, we see that the language employed in the instrument is entirely too vague and uncertain to constitute a valid trust. The duration of the estate attempted to be granted to the trustee, the nature and quantity of interest which the beneficiaries are to have, and the manner in which the trust is to be performed, are all left undeclared and without any reasonable certainty; and, of course, there is no statement of any of the purposes for which under section 857 an express trust may be declared. And this uncertainty also makes the attempted trust as to the personal property void.'' (See, also, *Barker* v. *Hurley, supra,* at p. 28; *Estate of Budd,* 166 Cal. 286, 291 [135 Pac. 1131]; *Estate of Webb,* 49 Cal. 541; *Noble* v. *Learned,* 153 Cal. 245, 250 [94 Pac. 1047].) The facts in the case at bar make fairly applicable the language of *Govin* v. *De Miranda,* 76 Hun, 414, 419 [27 N. Y. Supp. 1049, 1052]; "In no case has it ever been held as yet that a party may, by transferring his property from one pocket to another, make himself a trustee.''

Having reached the conclusion that upon no theory can the evidence be held sufficient to sustain a finding that the deed in question was based upon a valuable consideration as to the three children of said Prentice, we pass next to a consideration of appellant's contention that the evidence is without substantial conflict that said deed was executed and delivered by said George G. Prentice in contemplation of insolvency.

[9] It must be borne in mind that under section 3442 of the Civil Code "any transfer or encumbrance of property made or given voluntarily, or without a valuable consideration, by a party while insolvent or in contemplation of insolvency, shall be fraudulent, and void as to existing creditors.'' Under such a showing the fraudulent intent on the part of the grantee of such transfer is immaterial. (*Tobias* v. *Adams,* 201 Cal. 689 [258 Pac. 588]; *Chalmers* v. *Sheehy,*

132 Cal. 459 [84 Am. St. Rep. 62, 64 Pac. 709]; *Judson* v. *Lyford,* 84 Cal. 505 [24 Pac. 286]; *Knox* v. *Blanckenburg,* 28 Cal. App. 298 [152 Pac. 59].) It is also true that in such case the intent to defraud creditors is not required. See *Atkinson* v. *Western D. Syndicate,* 170 Cal. 503, 506 [150 Pac. 360], where we said: "If these conditions, to-wit, a grant made without consideration by a person insolvent or in contemplation of insolvency, are present, the intent of the grantor is immaterial and the transfer, regardless of the actual intent, is void as to creditors."

[10] The court found that respondent did not at the time of making said deed of September 14, 1917, anticipate that he would be insolvent with the property described in said deed gone and also that said deed was not made for the purpose of placing said property out of reach of his creditors, particularly appellant; that it was not executed in contemplation of insolvency but that said George G. Prentice was thoroughly solvent and abundantly able, out of other properties than the property covered by said deed, to pay all of his indebtedness.

The court also found in this connection that said George G. Prentice did not know he was indebted to appellant nor, if he was indebted to her, the amount thereof. However, significant facts concerning this matter are contained in a previous finding as follows: "That although defendant George G. Prentice well knew of his liability and duty to so account to plaintiff throughout all of the time heretofore mentioned during which said relationship existed, the said defendant George G. Prentice failed, refused and neglected to so account to plaintiff, but concealed from her during all of said time the actual status of their mutual accounts and concealed from her profits made in the transactions hereinbefore mentioned, and concealed from her the fact that he was indebted to her in various amounts growing out of the transactions covering all of said period and aggregating the sum aforesaid."

It is impossible to reconcile the fact that the court found that said respondent Prentice concealed from appellant, during the whole period of her transactions with him, the status of her account and concealed from her the profits made in the transactions for her and concealed from her the fact

that he was indebted to her in various sums, aggregating $39,145.29, with the finding that he did not know whether or not he was indebted to her at all. Indeed, the whole finding as to the good faith and lawful intent and noncontemplation of insolvency of respondent Prentice is colored, if not discredited, by the finding that he was thoroughly cognizant of and was unlawfully concealing from appellant his indebtedness to her and had been so concealing it from her from the inception of their transactions together, and yet, "not knowing that he was indebted to said plaintiff in a large sum of money, and not knowing that he was indebted to said plaintiff at all, for a good, valuable, sufficient and adequate consideration to him in hand paid by the other defendants in said action, did make, execute and deliver and place of record a good and sufficient deed of conveyance, etc. . . . "

[11] With a conflict in the findings directly reflecting upon the question as to whether or not defendant Prentice was contemplating insolvency in the execution of the deed, we approach the evidence on that question. It is true that at the time he made the deed, September 14, 1917, he was in the brokerage business and that complete collapse and admitted insolvency did not overtake him until some time in 1919. It is also true that on the date said deed was made he had a measure of credit at the banks and in the stores. But it must be borne in mind that he had lost $250,000 in stock speculations just prior to 1916, the opening date of said brokerage business. After 1916 he continued to speculate in stocks and, presumably at least, to lose money therein. At the time in question he was also conducting a fast-losing business as a brokerage house. The court in announcing its decision stated that said defendant had assets of $51,500 and debts to the amount of from $40,000 to $45,000. But counsel for appellant, with many grounds therefor, insists that the evidence shows only $46,500 in assets, as one item of $5,000 was duplicated in the court's footings of the schedule.

But whether it be the one amount or the other, the further facts are that within less than thirty days after making of the deed complete insolvency occurred when said defendant used $10,000 of the amount on hand and borrowed an additional $5,000 to pay losses in the said business, a part of

which, at least, must have existed on the day the deed was made. In less than four months these assets were reduced to something like $25,000 or $30,000, a state of hopeless insolvency. The property covered by the deed was 2,300 acres of valuable land for which defendant had paid some years previously $105,000 and which was valued by him at the time of trial at about $290,000. With this situation, including the facts detailed above, with plaintiff suspicious of him to the extent that she had closed her account with his company, and with his wife and children in the east and the wife "panicky" about her bonds, he made, executed, and recorded said deed and mailed it to them. This deed presumably removed from legal process the only piece of property that was not easily convertible. Under these facts can it be said that the finding that the debtor did not contemplate insolvency is supported by any competent evidence? What, pray, was he thinking about that so forcibly reminded him of the obligation to his wife and children that had for so many years been dormant? It is stretching credulity beyond the breaking point to say that substantial grounds exist for different conclusions from this evidence. The fact that bankers and merchants did not know of defendant's condition, or, if they did, that they still trusted him, does not point to a different conclusion as to what defendant had in contemplation when he made this deed.

[12] We are aware of and by no means intend to do violence to our rule that as to a finding of the court below on conflicting evidence, the conclusion of the lower court will not be disturbed. In *Tobias* v. *Adams, supra,* at pages 185, 186, we said: "For if a man keeps his bank account in the name of another admittedly to prevent his creditor from reaching it by legal process and then takes his entire estate and either puts it in his wife's name or deposits it in the name of his secretary, knowing that the judgments are in existence, his mere *ipse dixit* that it is not to defraud his creditor would hardly create a *bona fide* conflict in the testimony. 'While a finding will not be disturbed on appeal if there is a substantial conflict in the evidence from which it springs, "the evidence, in order to raise a conflict, must be such as to present a fair and reasonable ground for a difference of opinion" (*Field* v. *Shorb,* 99 Cal. 661 [34

Pac. 504]; *Felsenthal* v. *Warring*, 40 Cal. App. 119 [180 Pac. 67]).' (*White* v. *Greenwood*, 52 Cal. App. 737, 742 [199 Pac. 1095, 1098].)" Cases similar to the one under consideration and where a similar holding was made are *Judson* v. *Lyford, supra*, at p. 509, and *Daugherty* v. *Daugherty*, 104 Cal. 221, 223 [37 Pac. 889].

[13] Lastly, on cross-examination of said defendant Prentice, the following occurred: "Q. Now at the time you made this disposition of these bonds, in trust, as you say, did you give any bonds to Gordon Prentice? A. Yes, sir. Q. He had none left at the time of making this deed. Mr. Stearns: That is objected to as incompetent, irrelevant and immaterial. The Court: Objection sustained. (Plaintiff relies on exception.) Q. Gordon Prentice, your son, was manager of your business, was he? A. Yes, Q. During, and about the time of the transfer of this property? A. Yes, sir. Q. Did you have any property in your hands, bonds, which you placed in trust for Gordon Prentice at the time of the transfer of this deed? Mr. Stearns: We object to that as incompetent, irrelevant and immaterial, and not within any issues in this case. The Court: Objection sustained. (Plaintiff relies on exception.)"

The testimony was surely material. Gordon Prentice, the oldest son, was manager of the brokerage business and as such might have been liable to appellant for her losses therein. Moreover, the transaction with this son was material as to the *bona fides* of the transaction with the other children and the wife and the intent with which the deed was made as this son was not mentioned therein. Still further, if the defendant was indebted to this son in an amount comparable with the indebtedness admitted to the wife (he being of age and capable of receiving his quota of the bonds direct), then the defendant was insolvent beyond question at the time of the execution of the deed. This error is prejudicial and permeates the whole judgment.

Defendant at the time of the trial of this action was in the possession and enjoyment of this large estate in practically the same way as before the deed was made, enjoying a large and valuable property while his judgment creditor was denied relief on an indebtedness which he had for several years concealed from her and then refused to honor. The law, as we conceive it to be, as well as justice which

should, if possible, accompany it, requires a reversal of the judgment in this cause, and it is so ordered.

Shenk, J., Waste, C. J., Richards, J., Curtis, J., Seawell, J., and Langdon, J., concurred.